*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*


# OPINION

No. 04-08-00200-CV

Terry A. **LEONARD**, P.A. and April Dawn Hain, M.D.,
Appellants

v.

Andre **GLENN**,
Appellee

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CI-11855
Honorable Barbara Hanson Nellermoe, Judge Presiding

Opinion by:    Rebecca Simmons, Justice

Sitting:       Sandee Bryan Marion, Justice
               Rebecca Simmons, Justice
               Marialyn Barnard, Justice

Delivered and Filed:   May 20, 2009

AFFIRMED

This is an accelerated appeal, in a medical malpractice dispute, from the trial court's denial of motions to dismiss, under section 101.106(f) and chapter 74 of the Texas Civil Practice and Remedies Code. Plaintiff Andre Glenn sued Defendants Dr. April Hain and Physician Assistant Terry A. Leonard who were employed by Bexar County Hospital District d/b/a University Health Systems (UHS). Glenn alleged that Dr. Hain and Leonard improperly

prescribed Indomethacin, a prescription drug known to cause renal failure, despite Glenn's impaired renal function. Because Glenn's expert is qualified to testify regarding the prescribing of Indomethacin to a patient with a history of renal disease, we cannot say the trial court abused its discretion in denying Dr. Hain's and Leonard's motions to dismiss pursuant to section 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon 2005) (stating the requirements for an expert report in a health care liability claim). Because the written prescription did not constitute a use of tangible property, sovereign immunity was not waived, and the case could not have been brought against UHS. The trial court, therefore, did not err in denying Dr. Hain's and Leonard's motions to dismiss pursuant to section 101.106(f). *See id*. § 101.106(f). We, therefore, affirm the trial court's order denying the motions to dismiss pursuant to section 74.351 and the trial court's denial of the motion to dismiss pursuant to section 101.106(f). *See id*. §§ 74.351, 101.106(f).

### PROCEDURAL AND FACTUAL BACKGROUND

Over the course of several years, Glenn was treated at UHS for non-acute renal disease and gout.[1] On August 1, 2006, Glenn sought treatment for a painful right knee at the Acute Care Clinic at Community Medicine Associates, a facility owned and operated by UHS. Leonard, a physician assistant practicing under the supervision of Dr. Hain, a family practice physician, prescribed fifty milligrams of Indomethacin, to be taken three times a day, for an attack of gout.[2] Indomethacin is a type of nonsteroidal anti-inflammatory drug (NSAID) contraindicated for patients with renal failure. Following his discharge, Glenn filled the prescription at a pharmacy

---

[1] According to Glenn's expert, Glenn was previously treated in 2004 at the emergency center at UHS for gout and was prescribed colchicine. In 2005, when he was again treated for gout at UHS, the discharge notes in the medical records reflect that nonsteroidal anti-inflammatory drugs (NSAIDs) were to be avoided due to the presence of chronic renal insufficiency. Indomethacin is an NSAID.

[2] Gout is "a metabolic disease marked by a painful inflammation of the joints, deposits of urates in and around the joints, and usu[ally] an excessive amount of uric acid in the blood." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 541 (11th ed. 2008). Uric acid is "a white odorless . . . and nearly insoluble acid . . . that . . . is present in small quantity in human urine." *Id*. at 1377

unrelated to UHS. After taking the Indomethacin for a short time period, Glenn suffered an abrupt decline in renal function, ultimately resulting in the development of chronic renal disease requiring dialysis. Glenn contends that, but for the Indomethacin, his underlying renal disease would not have required dialysis within the immediate future.

On August 8, 2007, Glenn filed suit against Leonard for improperly prescribing the Indomethacin and Dr. Hain under various respondeat superior theories and for negligent supervision of Leonard. Attached to the petition was an expert report prepared by Dr. Keith Klein and Dr. Klein's curriculum vitae. Dr. Hain and Leonard both filed objections to the expert report and motions to dismiss based on the report's failure to meet the requirements set forth in section 74.351. *See id.* § 74.351. Dr. Hain and Leonard also filed motions to dismiss because the suit could have been brought against their employer, UHS. *See id.* § 101.106(f).[3] On November 7, 2007, Glenn filed a supplemental expert report prepared by Dr. Klein. In response, Dr. Hain filed objections to the supplemental expert report and a motion to dismiss pursuant to chapter 74. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon 2005).

The trial court denied Dr. Hain's and Leonard's objections to the expert report and motions to dismiss pursuant to chapter 74 and section 101.106(f) of the Texas Civil Practice and Remedies Code. In a joint appeal, Dr. Hain and Leonard seek review of the trial court's denials of their motions to dismiss. We will first address the adequacy of the expert reports.

---

[3] Section 101.106(f) provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f) (Vernon 2005).

**TEXAS CIVIL PRACTICE AND REMEDIES CODE SECTION 74.351**

In accordance with section 74.351 of the Texas Civil Practice and Remedies Code, Glenn served Dr. Hain and Leonard with an original expert report and a supplemental report prepared by Dr. Keith Klein.  Dr. Hain and Leonard argue that Dr. Klein's expert reports are inadequate because they fail to establish his qualifications to opine on the standards of care applicable to a family practice physician and a physician assistant as set forth in sections 74.401 and 74.402.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.401, 74.402 (Vernon 2005).  More specifically, Dr. Hain asserts that neither Dr. Klein's reports nor his curriculum vitae demonstrate his training or experience supervising a physician assistant in an acute care setting.  Leonard contends that Dr. Klein is a nephrologist and his curriculum vitae does not demonstrate his particular knowledge, training, or experience relating to a physician assistant treating a sore knee.

### A.  Standard of Review

We review a trial court's decision regarding the adequacy of an expert report under an abuse of discretion standard.  *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001).  An abuse of discretion occurs when a trial court "acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles."  *Bowie Mem'l Hosp.*, 79 S.W.3d at 52.  The proponent of the expert report bears the burden to demonstrate the expert is qualified.  *Broders v. Heise*, 924 S.W.2d 148, 151-52 (Tex. 1996).

### B.  Statutory Requirements

A plaintiff in a medical malpractice case must provide each defendant physician and health care provider with an expert report.  TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon 2005).  An expert report is:

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id*. § 74.351(r)(6).  The report need only provide enough information to fulfill two purposes:  (1) it "must inform the defendant of the specific conduct the plaintiff has called into question;" and (2) it "must provide a basis for the trial court to conclude that the claims have merit."  *Palacios*, 46 S.W.3d at 879.

### 1. Dr. Keith Klein

Klein's expert reports and his attached curriculum vitae set forth his extensive credentials in the field of nephrology.[4]  Dr. Klein was licensed to practice medicine in 1972, completed his internal medicine residency in 1976, and, in 1978, completed a nephrology fellowship.  He is board certified in internal medicine and the subspecialty of nephrology.  Since 2004, Dr. Klein has served as the Clinical Chief of Nephrology at the David Geffen School of Medicine at University of California at Los Angeles, and, for the last twenty-seven years, he has worked as an attending physician and in private practice in the fields of internal medicine, hypertension, and nephrology.  Dr. Klein has also worked as a Clinical Professor of Medicine at UCLA since 1995.[5]

Both Leonard and Dr. Hain concede that Dr. Klein is qualified to testify as to the effect of Indomethacin on a patient with reduced kidney function, and more specifically on whether Indomethacin caused Glenn's injuries.  Dr. Hain and Leonard contend that the expert reports do

---

[4]  Nephrology is "a branch of medicine concerned with the kidneys."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 831 (11th ed. 2008).

[5]  Among his other extensive experiences in internal medicine, Dr. Klein's experience specifically associated with nephrology includes:  a nephrology fellowship, membership in four medical societies specifically associated with nephrology, honors awarded from the National Kidney Foundation and the Kidney Foundation of Southern California, private practice and a practice at Cedars Sinai Medical Center in nephrology,

not, however, establish that Glenn is qualified to testify to the standard of care for a family practice physician and a physician assistant in an acute care setting. We turn to chapter 74's expert requirements to determine whether Dr. Klein is qualified.

*2. Dr. April Hain: Section 74.401— Expert Witness in Suit Against Physician*

To qualify as an expert witness who may render a report in a suit against a physician, the physician preparing the report must be qualified to offer an opinion regarding the standard of care by meeting the requirements of section 74.401. TEX. CIV. PRAC. & REM. CODE ANN. § 74.401 (Vernon 2005). More specifically, section 74.401(a) provides that:

> a person may qualify as an expert witness on the issue of whether the physician departed from acceptable standards of medical care only if the person is a physician who:
> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id*. §§ 74.401(a), 74.351(r)(5)(A). To determine whether an expert's training or experience yields sufficient qualifications to offer an expert opinion regarding acceptable standards of medical care, an appellate court considers whether the expert:

> (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and
> (2) is actively practicing medicine in rendering medical care services relevant to the claim.

*Id*. § 74.401(c). The party offering the witness as an expert must also establish that the witness is qualified to testify under Rule 702 by demonstrating the witness has relevant "knowledge, skill, experience, training, or education." TEX. R. EVID. 702; TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C) (Vernon 2005) (requiring an expert physician to be "qualified . . . under the

Texas Rules of Evidence"); *Broders*, 924 S.W.2d at 153 (holding that a witness's qualification depends on "whether the expert's expertise goes to the very matter on which he or she is to give an opinion."); *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 762 (Tex. App.— Houston [14th Dist.] 2007, no pet.). Furthermore, the qualifications of the expert necessary to fulfill the criteria of an expert report, as defined in section 74.351, must be found within the four corners of the expert report itself and the expert's curriculum vitae. *Palacios*, 46 S.W.3d at 878; *Burrell*, 230 S.W.3d at 758.

The parties agree that Dr. Klein was practicing medicine at the time the claim arose. Dr. Hain disputes Dr. Klein's qualifications based on the second and third prongs of section 74.401(a) because Dr. Klein does not treat the "illness, injury, or condition" involved in the claim and is not "qualified on the basis of training or experience" to offer an opinion. Specifically, Dr. Hain contests Dr. Klein's training or experience on the standard of care for a family practice physician in an acute care setting who is supervising a physician assistant treating a patient for a painful and swollen knee.[6] We believe Dr. Hain has characterized the issue in this case too narrowly, and has failed to focus on the "standards of medical care for the diagnosis, care or treatment of the . . . condition involved in the claim."[7] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(3) (Vernon 2005).

The statute does not require a medical expert to practice in the exact *same field* as the defendant physician. Rather, the physician need only be "actively practicing medicine in rendering medical care services *relevant to the claim*." *Id*. § 74.401(c)(2) (emphasis added); *see*

---

[6] Dr. Hain supervised Leonard, her physician assistant. The supervising doctor is responsible for the actions taken by the physician assistant. TEX. OCC. CODE ANN. § 204.204(a) (Vernon 2004) ("A physician assistant shall be supervised by a supervising physician. The supervising physician oversees the activities of, and accepts responsibility for, medical services provided by the physician assistant.").

[7] We note that, in discussing whether a waiver of governmental immunity exists in this case, Appellants characterize Glenn's claim narrowly: "Leonard and Hain were negligent in prescribing Indomethacin and that the use of the medication was the direct cause of Glenn's injuries."

*also Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003); *Broders*, 924 S.W.2d at 152; *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 1999, no pet.). The claim before us is not about the presentment of a painful knee to a physician assistant, but rather the alleged negligent treatment of the knee with a contraindicated drug. The "illness, injury, or condition" involved the diagnosis of "an attack of gout" and the prescribing of a contraindicated drug—Indomethacin—to an individual with renal disease. We must, therefore, determine if Dr. Klein's report reflects that he has the necessary qualifications to provide an opinion on the medical standard of care for prescribing Indomethacin for gout to an individual with renal disease.

In addition to his qualifications detailed previously, Dr. Klein is listed as the author or co-author of a number of articles relating to renal failure and attendant complications. In his expert report, Dr. Klein opines that both Leonard and Dr. Hain "should have been aware of Mr. Glenn's past medical history and should have avoided the use of Indomethacin which caused the progression of his renal disease." Dr. Klein references Glenn's medical records and states that "[a]mong the problem list[ed] are 'nephritis and nephropathy' suggesting the prescribing doctor was aware of the preexisting renal disease at the time of this visit."[8] According to Dr. Klein, the use of Indomethacin "was a significant error in medical judgment and represents a significant adverse event due to either lack of fundamental knowledge of the indications and safe usage of this particular medication or lack of proper review of the medical record due to negligence."[9]

In the supplemental expert report, Dr. Klein opines that "[t]he use of [Indomethacin] in Mr. Glenn is the cause of a precipitous decline in renal function to a level requiring dialysis." He

---

[8] Nephritis is an "acute or chronic inflammation of the kidney caused by infection, degenerative process, or vascular disease." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 831 (11th ed. 2008). Nephropathy is "an abnormal state of the kidney; *esp* : one associated with or secondary to some other pathological process." *Id.*

[9] For purposes of this opinion, we accept the characterization of the medical records contained in the expert reports but make no judgment as to the merits of the action. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001) ("[T]he only information relevant to the inquiry is within the four corners of the document.").

details the well known result of prescribing Indomethacin to individuals to whom such medication is contraindicated:

> Indomethacin is well known to produce rapid declines in renal function and is particularly nephrotoxic in any patient with a slight impairment of renal function. Its use is strictly and absolutely contraindicated in such patients, and there is no medical condition for which its use is so necessary that alternative equally effective medications are [not] available.
>
> In fact, Indomethacin is so profoundly nephrotoxic, that it is often used in experimental animal models to produce kidney disease for purposes of research.
>
> The toxicity of Indomethacin is not an allergic response, such that the decline in renal function is a predictable and not random event. Indomethacin, given in sufficient quantities for a period of time[,] will consistently cause a decline in renal function to all patients to whom it is administered. In the patient with a reduction in kidney function, the toxicity of Indomethacin will occur at lower doses and much earlier.

Dr. Hain relies on *In re Windisch*, 138 S.W.3d 507 (Tex. App.—Amarillo 2004, no pet.), and *Clark v. HCA, Inc.*, 210 S.W.3d 1 (Tex. App.—El Paso 2005, no pet.), for support that Dr. Klein, although qualified to opine about renal failure, is unqualified to opine about the treatment of a patient with acute knee pain and a known history of gout. In *Windisch*, the plaintiff was diagnosed with a large brain tumor and referred to Dr. Windisch, a neurosurgeon, for several procedures, but "subsequently suffered from seizures and significant neurological impairment." *Windisch*, 138 S.W.3d at 509. Attached to the plaintiff's petition was an expert report prepared by a radiologist opining that "Windisch's care . . . fell below the accepted standard of care when he performed the [neurological procedures]." *Id*. The Amarillo Court of Appeals noted that the expert report "failed to provide a basis on which the court could find [the expert] was qualified to render an expert opinion" on neurological procedures. *Id*. at 512. The expert was a radiologist and, although he had served a fellowship in neurology, the report was inadequate for the statutory purposes because it did not indicate that the expert had experiences which could

reasonably be said to demonstrate the necessary knowledge of the accepted standard of care for the procedure that formed the basis of the claim. *Id*. at 514.

Similarly, in *Clark v. HCA,* the expert report addressed a claim for complications associated with the prescribing of Lovenox, an anticoagulant. *Clark*, 210 S.W.3d at 4. Although the expert's curriculum vitae indicated that he was board certified in internal medicine, oncology, and nuclear medicine, it did not reflect that he was currently practicing hematology or had any experience with this particular anticoagulant. *Id.* at 7-8.

The foregoing cases are distinguishable. The relevant claim in the present case is not the negligent treatment of a sore knee, but the negligent prescribing of Indomethacin for an individual with renal disease that was documented in the medical records. Dr. Klein criticizes Dr. Hain and Leonard for their failure to "[be] aware of Mr. Glenn's past medical history and . . . [avoid] the use of Indomethacin." Unlike the expert reports in *Windisch* and *Clark*, Dr. Klein's reports and accompanying curriculum vitae establish his extensive experience and current practice in the area of internal medicine, nephrology, and renal failure.

Finally, Dr. Hain criticizes the failure of the expert reports to establish Dr. Klein's experience in supervising a physician assistant.[10] She contends the lack of such experience renders Dr. Klein unqualified to give his opinion in this matter. However, the expert reports are not based on and do not criticize Dr. Hain for the failure to adequately supervise her physician assistant Leonard, but instead criticize both parties' failure to review the medical records and avoid prescribing contraindicated medication: "Ms. Terry and her supervisor Dr. Hain should have been aware of Mr. Glenn's past medical history and should have avoided the use of

---

[10] "The supervising physician oversees the activities of, and accepts responsibility for, medical services provided by the physician assistant." TEX. OCC. CODE ANN. § 204.204(a) (Vernon 2004).

Indomethacin which caused the progression of his renal disease." We hold Dr. Klein need not have experience in supervising a physician assistant to render such an opinion.

We believe the expert reports establish that Dr. Klein is very familiar with the drug Indomethacin and its effects on individuals with renal disease and the likely outcome of its use by such individuals. Under the facts presented, we cannot conclude that the trial court abused its discretion in accepting Dr. Klein's qualifications to render an opinion regarding the standard of care provided by Dr. Hain. We, therefore, overrule this issue on appeal.

*3. Terry Leonard: Section 74.402—Expert Witness in Suit Against Health Care Provider*

An expert providing opinion testimony regarding whether a health care provider departed from the accepted standards of care must satisfy the requirements set forth in section 74.402. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402 (Vernon 2005). Section 74.402(b) provides three specific qualifications that an expert witness must possess before providing opinion testimony on a health care provider's departure from accepted standards of health care:

> (b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id*. § 74.402(b). "Practicing health care" is defined as:

> (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or
> (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

-11-

*Id*. § 74.402(a)(1), (2); *Group v. Vicento*, 164 S.W.3d 724, 731 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (holding that sections 74.402(a)(1)-(2)'s and (b)(1)'s phrases defining qualifying conduct for "practicing health care" are phrases of enlargement, not limitation, and are not exclusive). In determining whether an expert is qualified on "the basis of training or experience," the court considers whether the expert is:

> (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and
> (2) is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(c) (Vernon 2005). Thus, for Dr. Klein to be qualified under section 74.402, he must be "practicing health care" and possess sufficient "training and experience" to offer expert opinions.

### a. Practicing Health Care

This case is analogous to *In re Stacy K. Boone*, wherein the physician assistant was under a cardiologist's supervision and treated a patient for a condition a cardiologist was qualified to treat. *In re Stacy K. Boone*, 223 S.W.3d 398, 405 (Tex. App.—Amarillo 2006, orig. proceeding). The court looked to how the expert's report defined the negligent conduct, and what standard of care was required by each of the individual defendants. *Id*. The expert report did not separately identify a standard of care for the physician assistant. However, the court of appeals noted the expert ascribed the same standard of care to the physician assistant as to the others included in the "physician" group in the report. *Id*. at 405. The expert opined that the standard of care required "each individual involved in the administration of [the patient's] therapy" to recognize an ongoing serious problem and take action. *Id*. at 405-06. Because the physician assistant was

in the same practice area as the physician, the court of appeals held the expert qualified to opine on the standard of care for the physician assistant. *Id*. at 404.

In *Group v. Vicento*, the Houston Court of Appeals read section 74.402 subsections (a) and (b)(1) together to expand the definition of "practicing health care" to include an expert practicing health care in a field of practice involving the same type of care or treatment. *Group*, 164 S.W.3d at 731. The *Group* court noted the expert report's explanation of how the specialties of chiropractic medicine and anesthesia overlap and affirmed the anesthesiologist's qualification to state the standard of care. The court reasoned that because an anesthesiologist used similar pain management modalities as chiropractors, the expert anesthesiologist was qualified. *Id*. at 732-33; *see also Simonson v. Keppard*, 225 S.W.3d 868, 883 (Tex. App.—Dallas 2007, no pet.) (O'Neill, J., dissenting) (noting that section 74.402(b)(1) provides a different emphasis adding "language requiring experts opining about 'health care providers' to be practicing health care in a 'field of practice that involves the same type' of care").

b. Training and Experience

Leonard argues that Dr. Klein must be qualified to render an opinion regarding the standard of care for a physician assistant in an acute care setting treating a patient complaining of knee pain. Yet, as with Dr. Hain, based on Glenn's petition and the expert reports, the relevant standard of care is the appropriate prescription of medication for a patient presenting with gout and a history of renal disease.

As outlined above, Dr. Klein has extensive experience in the field of nephrology and the effects of Indomethacin on patients suffering from renal failure. Attached to Dr. Klein's reports is his four page curriculum vitae demonstrating that he was practicing health care in a field that "involved the same type of care or treatment" as an individual prescribing the medication

Indomethacin to a gout patient with an extensive and well documented history of chronic kidney disease. *See Broders*, 924 S.W.2d at 153-54 ("Our holding does not mean that only a neurosurgeon can testify about the cause in fact of death from an injury to the brain, or even that an emergency room physician could never so testify. . . . [T]he offering party [must] establish that the expert has 'knowledge, skill, experience, training, or education' [to qualify the expert in that particular case])." *Baptist Hosp. of Se. Tex. v. Carter*, No. 09-08-067-CV, 2008 WL 2917109, *4 (Tex. App.—Beaumont July 31, 2008, no pet.) (mem. op.) (requiring an expert comply with Texas Rule of Evidence 702 regarding "the specific issue before the court").

Furthermore, Dr. Klein's training and experience are comparable to those of experts that other appellate courts have held to be qualified to opine regarding health care providers. *See San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 813-14 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (determining that infectious disease specialist could opine on the standard of care against nurses under section 74.402); *IHS Acquisition No. 140, Inc. v. Travis*, No. 13-07-481-CV, 2008 WL 1822780, at *4-5 (Tex. App.—Corpus Christi Apr. 24, 2008, pet. denied) (mem. op.) (deciding geriatric doctor was qualified to provide standard of care opinion as to defendant nursing home); *Burrell*, 230 S.W.3d at 758-62 (noting that infectious disease specialist qualified to opine standard of care against defendant hospital); *Ne. Med. Ctr., L.P. v. Crooks*, No. 06-05-00149-CV, 2006 WL 1358361, at *4 (Tex. App.—Texarkana May 19, 2006, no pet.) (mem. op.) (concluding that physician was qualified to offer an opinion regarding the standard of care for routine hospital admission orders and prevention of patients falling out of bed).

The expert report and attached curriculum vitae clearly substantiate that he "has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim" and that he was "qualified on

the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2), (b)(3) (Vernon 2005). The gravamen of Dr. Klein's standard of care opinions is that Leonard breached the standard of care for a physician assistant treating a patient with documented renal disease with Indomethacin, an NSAID, when "[n]umerous other anti-inflammatory medications and analgesic preparations were available to these practitioners and the avoidance of the medicine in this case would have prevented Mr. Glenn's damages." *See IHS Acquisition No. 140, Inc.*, 2008 WL 1822780 at *4-5 (stating that the issue was not whether the expert had worked in a nursing home, but whether he was "knowledgeable about the standard of care applicable to elderly and infirm persons"). Dr. Klein's opinion is that the acceptable standard of care for treating gout in someone with Glenn's medical history is that no one should have prescribed Indomethacin. As such, Dr. Klein was sufficiently qualified to opine: "It should be obvious Ms. Terry Leonard and her supervisor Dr. Hain should have been aware of Mr. Glenn's past medical history and should have avoided the use of Indomethacin which caused the progression of his renal disease."

Accordingly, we hold that the trial court did not abuse its discretion in determining that Dr. Klein demonstrated sufficient familiarity with the standards of care applicable to patients with a history of renal disease to meet the requirements of section 74.402. Dr. Klein was, therefore, qualified on the basis of training and experience to provide an opinion as to the accepted standard of care by Leonard, a physician assistant, for prescribing Indomethacin to Glenn. Thus, we overrule this issue on appeal.

We next turn to the question of sovereign immunity and whether claims against UHS could have been brought under section 101.106(f) of the Texas Civil Practice and Remedies Code.

**TEXAS CIVIL PRACTICE AND REMEDIES CODE SECTION 101.106(f)**

Leonard and Dr. Hain contend the trial court erred in failing to dismiss Glenn's suit because Glenn failed to timely substitute their governmental employer, UHS, under section 101.106(f) of the Texas Civil Practice and Remedies Code.[11] Section 101.106(f) provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f) (Vernon 2005). In effect, section 101.106(f) provides immunity to an employee by requiring either the substitution of the governmental entity for the employee or the dismissal of the plaintiff's suit when: (1) it is based on employee conduct within the general scope of his employment, and (2) it could have been brought under the Tort Claims Act against the governmental entity. *See Phillips v. Dafonte*, 187 S.W.3d 669, 673 (Tex. App.—Houston [14th Dist.] 2006, no pet.). There is no question that both Dr. Hain and Leonard were acting within the scope of their employment. Our analysis, therefore, requires a determination of whether Glenn's claims "could have been brought" against UHS or if such claims are barred by governmental immunity. *See Harris County v. Sikes*, 136 S.W.3d 635, 638 (Tex. 2004).

**A. Standard of Review**

In the present case, whether the trial court erred in failing to dismiss the action because Glenn did not substitute UHS for appellants hinges on whether governmental immunity bars the

---

[11] Governmental employees asserting immunity under section 101.106(f) are entitled to an interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(5) (Vernon 2008); *Phillips v. Dafonte*, 187 S.W.3d 669, 673 (Tex. App.—Houston[14th Dist.] 2006, no pet.).

suit against UHS. Immunity from suit deprives the trial court of subject matter jurisdiction over a case. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003). Whether a court has subject matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). Although we generally review a motion to dismiss under an abuse of discretion standard, the substance of the issue to be resolved dictates the review. *See In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000) (determining that the proper standard of review is based on "whether the [issue] is a question of fact or of law"); *Kanlic v. Meyer*, 230 S.W.3d 889, 892 (Tex. App.—El Paso 2007, pet. denied) (finding standard of review of motion to dismiss under section 101.106 to be de novo because the issue involved official immunity under the Texas Tort Claims Act). Because we are reviewing a jurisdictional issue, we apply a de novo standard of review. *Miranda*, 133 S.W.3d. at 228. As movants on the motions to dismiss, Leonard and Dr. Hain bore the burden to establish that Glenn could have brought suit against UHS. *See Sheth v. Dearen*, 225 S.W.3d 828, 830 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Thus, Leonard and Dr. Hain must establish that the condition or use of tangible property, real or personal, proximately caused the damages alleged. *Id.* at 831-32.

## B.  Waiver of Immunity

Under the doctrine of sovereign immunity, the State is not liable for the negligent acts of its employees absent a constitutional or statutory provision waiving immunity. *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 298 (Tex. 1976). Section 101.021 waives immunity for personal injury caused by the negligence of a government employee acting in the course and scope of his employment if the injury is caused by a condition or use of tangible property. TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (Vernon 2005). The "non-use" of tangible property, however, does not waive immunity. *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996).

## C. Alleged Conduct

Glenn's original petition alleges that Leonard "diagnosed [Glenn's] condition as gout, even though he would have known from an adequate history and physical that at least a portion of the pain was due to a recent fall from a bicycle. [Leonard] was unaware, chose to ignore or did not realize the significance of [Glenn's] chronic renal failure" and elected to prescribe Indomethacin, despite being contraindicated. Glenn also alleges that Dr. Hain is responsible for the negligent care provided by Leonard under various theories of respondeat superior.

Leonard and Dr. Hain contend that, based on Glenn's pleadings and the expert reports prepared by Dr. Klein, Glenn is asserting personal injuries caused by the use of Indomethacin, i.e., the use of tangible personal property, and, thus, governmental immunity is waived under section 101.021. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (Vernon 2005) ("A governmental unit in the state is liable for . . . personal injury . . . caused by use of tangible personal or real property if the governmental unit would, were it a private person, be liable."). Leonard and Dr. Hain refer specifically to Dr. Klein's report as evidence that the prescription for Indomethacin was the actual cause of the injury and constitutes use of tangible property. Specifically, Leonard and Dr. Hain refer to page three of Dr. Klein's report:

> The *use* of this medicine in Mr. Glenn is *the cause* of a precipitous decline in renal function to a level requiring dialysis. [Its] use was a significant error in medical judgment and represents a significant adverse event due to either a lack of fundamental knowledge of the indications and safe *usage* of this particular medication, or lack of proper review of the medical record due to negligence.

Moreover, Leonard and Dr. Hain argue that Dr. Klein's report "makes it crystal clear" that the use of Indomethacin was the direct cause of Glenn's injuries. *Compare Tejada v. Rowe*, 207 S.W.3d 920, 925 (Tex. App.—Beaumont 2006, pet. filed) (looking to the expert report's assertion that the *use* of Pitocin caused the brain injuries), *with Clark v. Sell*, 228 S.W.3d 873,

875 (Tex. App.—Amarillo 2007, pet. filed) (rejecting appellant's claim that plaintiff's injury was caused by the use of medication and, instead, concluding that the injury resulted from negligent performance of medical services). In short, Leonard and Dr. Hain argue that the prescribing of the medication was both a use of tangible property and the direct cause of Glenn's injury.

**D. Use or Non-Use**

The question of the government's use of property has plagued our justice system since the enactment of the Texas Tort Claims Act. As Justice Hecht explained in *Texas Department of Criminal Justice v. Miller*, 51 S.W.3d 583, 590 (Tex. 2001) (Hecht, J., concurring), "[t]he Tort Claims Act does not define 'use', and nothing in the history of its passage provides a clue as to the standard's intended meaning." Based on the Legislature's failure to provide a better definition of "use," we are left to parse the finest distinctions and variations in facts, in over four decades of appellate court decisions, seeking clarity in the application of "use."

The Supreme Court has attempted to provide parameters for governmental use by adopting the ordinary meaning of the word "use." As such, the term "use" means "to put or bring into action or service; to employ for or apply to a given purpose." *Id.* at 588 (majority opinion). Yet, the involvement of property, alone, is insufficient and a use that merely "furnish[es] the condition that [makes] the injury possible" does not waive immunity. *Id.* (internal quotations omitted). Moreover, it is the government's use of the property that must have actually caused the injury. *Id.*

The cases Glenn relies upon to support the lack of use in the present case include *San Antonio Hospital v. Cowan*, 128 S.W.3d 244 (Tex. 2004), *Archibeque v. North Texas State Hospital-Wichita Falls Campus,* 115 S.W.3d 154 (Tex. App.—Fort Worth 2003, no pet.), and *Texas Department of Criminal Justice v. Miller*, 51 S.W.3d 583 (Tex. 2001). In each of the

foregoing cases, the courts examined whether the use of tangible property was the actual cause of the injuries. Although property may have been used, to some degree, or even contributed to the injury, in each of the foregoing cases, the courts' analysis rested on the fact that the property in question was not the cause of the injury. To the contrary, it was the negligence of an employee that was the ultimate cause of the injury.

Dr. Hain and Leonard argue the present case is more akin to the cases involving the dispensing of medication by a hospital employee. *See Quinn v. Mem'l Med. Ctr.*, 764 S.W.2d 915, 917 (Tex. App.—Corpus Christi 1989, no writ) ("We hold that the dispensing of a drug by a hospital pharmacy is a use of tangible personal property and falls within the waiver provisions of the statute."); *Wise Reg'l Health Sys. v. Brittain*, 268 S.W.3d 799, 807 (Tex. App.—Fort Worth 2008, no pet.) (holding that the plaintiff's allegations that a nurse administered medications, when she should have refused to do so in light of the patient's condition, constituted use of medication and waiver of immunity); *Edinburg Hosp. Auth. v. Trevino*, 904 S.W.2d 831, 838 (Tex. App.—Corpus Christi 1995), *rev'd on other grounds*, 941 S.W.2d 76 (Tex. 1997) (determining that the dispensing of drug by hospital pharmacy was "use"); *Adams v. Rios*, No. 14-95-00239-CV, 1996 WL 337108, at *4 (Tex. App.—Houston [14th Dist.] June 20, 1996, no writ) (not designated for publication) (noting that pleadings asserted that the medical facility was negligent in the use of the drug Halcion). *But see Somervell County Healthcare Auth. v. Sanders*, 169 S.W.3d 724, 727-28 (Tex. App.—Waco 2005, no pet.) (holding that when the medication was prescribed by a personal physician and dispensed by an independent pharmacist, the nursing home's distribution of the medication in accordance with the prescribing doctor's directions did not constitute use).

Here, the medication, which is the alleged tangible property, was not used by either Leonard or Dr. Hain, but was instead used by Glenn. Leonard and Dr. Hain argue the writing of a prescription is akin to the *Quinn* court's determination that "dispensing of a drug by a hospital pharmacy is a use of tangible personal property and falls within the waiver provisions of the statute." *See Quinn*, 764 S.W.2d at 917. Unlike *Quinn*, however, neither Leonard nor Dr. Hain dispensed the medication to Glenn. Importantly, Glenn filled the prescription after he was discharged from UHS.

Furthermore, it is the governmental unit's use of the property that must cause the injury. In *San Antonio State Hospital v. Cowan*, 128 S.W.3d 244, 245 (Tex. 2004), a patient's estate filed suit against the hospital after the patient committed suicide using suspenders and a walker that the hospital failed to confiscate. The court held that waiver of governmental immunity under section 101.021(2) only arises from the hospital's use of tangible property, not from the patient's use of the tangible property. *See id.* at 245-46 (indicating the statute does not expressly include this requirement but case law does); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (Vernon 2005) (showing no express requirement).

**E. Tangible Property**

Even if appellants established governmental use, they must also establish the use or misuse of "tangible" property. Additionally, Glenn argues the prescription for Indomethacin is not tangible property and, therefore, not a use of tangible property sufficient to waive sovereign immunity. Glenn's claims focus on the appellants' failure to use Glenn's past medical history contained within UHS medical records to determine that Indomethacin was contraindicated. Medical information is generally not considered tangible property. *Phillips*, 187 S.W.3d at 677. Leonard and Dr. Hain's prescribing of Indomethacin is better analogized with *University of*

*Texas Medical Branch at Galveston v. York*, 871 S.W.2d 175 (Tex. 1994), wherein the complaint alleged misuse of tangible personal property by personnel who failed to properly record medical information and also failed to rely on recorded information.  The *York* court held that although "information about a patient's condition is tangible in that the paper can be seen and touched, information itself is an abstract concept . . . [and] thus, is intangible; the fact that information is recorded in writing does not render the information tangible property." *Id.* at 179; *see also Salas v. Wilson Mem'l Hosp. Dist.*, 139 S.W.3d 398, 404 (Tex. App.—San Antonio 2004, no pet.) (holding that an allegation of misuse of information in medical records is not sufficient to allege a use or misuse of tangible property).  As in *York*, the instant case is based on an alleged misuse or failure to use the information recorded in Glenn's records, which resulted in an improvidently written prescription.  *York*, 871 S.W.2d at 178-79.  The crux of Glenn's allegations is Leonard's disregard or failure to realize the significance of Glenn's chronic renal failure documented in his medical history and, based on that failure, prescribing an inappropriate medication.  Accordingly, we hold that Glenn's allegations do not constitute a use or misuse of tangible property sufficient to substantiate a waiver of governmental immunity.  The trial court, therefore, properly denied the motion to dismiss pursuant to section 101.106(f).  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f) (Vernon 2005).

## CONCLUSION

Because Glenn's expert reports establish the expert's qualifications to opine on the standards of care applicable to the prescribing of Indomethacin to an individual with chronic kidney disease, we affirm the trial court's denial of the motion to dismiss pursuant to section 74.351.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon 2005).  Moreover, the prescribing of Indomethacin did not constitute a use of tangible property and thus, Glenn's claim

could not have been brought against UHS. Accordingly, the trial court did not err in denying Leonard and Dr. Hain's Motion to Dismiss pursuant to section 101.106(f). *See* TEX. CIV. PRAC. & REM. CODE. ANN. § 101.106(f) (Vernon 2005).

We, therefore, affirm the trial court's order with regard to the section 74.351 expert reports and the trial court's order with regard to the motion to dismiss pursuant to section 101.106(f).

Rebecca Simmons, Justice