

## IN THE
## TENTH COURT OF APPEALS

### No. 10-18-00240-CV

JAYNE R. SCHULTE, M.D. AND GREGORY C.
MCKEEVER, M.D., MY DOCTOR, PA D/B/A
HUNTSVILLE PEDIATRICS AND ADULT
MEDICINE ASSOCIATES, URMIL SHUKLA, M.D.
AND TEXAS SURGERY CENTER, P.A.,

                                                            Appellants

 v.

RESA VACO AND TAMMY VACO,

                                                            Appellees

From the 12th District Court
Walker County, Texas
Trial Court No. 1728450

## MEMORANDUM OPINION

Resa and Tammy Vaco filed a medical malpractice suit against Urmil Shukla,

M.D., Texas Surgery Center, P.A., Jayne Schulte, M.D., Gregory McKeever, M.D., and My

Doctor, P.A., d/b/a/ Huntsville Pediatric and Adult Medicine Associates.  The Appellants

objected to the medical expert reports filed by the Vacos. The trial court overruled the objections and the motions to dismiss. We affirm.

## Background Facts

Resa Vaco underwent a sleeve gastrectomy bariatric surgery on May 20, 2015, and developed severe nausea and vomiting after the surgery. On June 12, 2015, he saw his primary care physician, Dr. Schulte for the nausea. Vaco saw Dr. Schulte again on July 16 and July 24, 2015, where he again complained of nausea and also dizziness, visual changes, and unsteadiness. Vaco was admitted to Huntsville Memorial Hospital on July 25, 2015, and Dr. McKeever prescribed medicine for dizziness. Dr. Shukla also saw Vaco on July 25, 2015, and performed an EGD, an upper scope procedure. Vaco was discharged from the hospital on July 27, 2015, but returned on July 29, 2015, complaining of chest pain, numbness, and difficulty standing. A lab test showed that Vaco had a low thiamine level, and Dr. Schulte prescribed thiamine which resulted in prompt improvement of Vaco's neurological symptoms. Vaco was discharged from the hospital on August 1, 2015, and on August 17, 2015, he had a follow-up appointment with Dr. Shukla. At that time Vaco reported that his dizziness and numbness was returning. Vaco was diagnosed with Wernicke's encephalopathy and alleges that he still has problems with memory loss, numbness, and loss of function at work.

Vaco served three expert reports in accordance with Chapter 74 of the Texas Civil Practice and Remedies Code prepared by: bariatric surgeon John Pilcher, M.D.; internist

Benny Gavi, M.D.; and neurologist Steven Lovitt, M.D. All of the appellants objected to the reports, and the trial court granted a 30 day extension to allow Vaco to amend the reports. Vaco then served a supplemental report from Dr. Lovitt and an amended report from Dr. Gavi. The appellants objected to the supplemental and amended reports. After a hearing, the trial court overruled the objections and found the reports sufficient. Each of the appellants filed a brief challenging the trial court's ruling.

**Standard of Review**

We review the trial court's decision on the adequacy of an expert's report for abuse of discretion. *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Rice v. McLaren*, 554 S.W.3d 195, 200 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

To constitute a good-faith effort to provide a fair summary of an expert's opinions, an expert report must discuss the standard of care, breach, and causation. *Palacios*, 46 S.W.3d at 875. The report need not use "magic words" or meet the same standards as evidence offered on summary judgment or at trial. *Rice v. McLaren*, 554 S.W.3d at 200. To constitute a good-faith effort to comply with these requirements, the expert report must provide enough information to fulfill two purposes of the statute: (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a

basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 875; *Rice v. McLaren*, 554 S.W.3d at 201.

## Expert Reports

Expert report means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC & REM CODE ANN. § 74.351 (r) (6) (West 2017). We determine whether an expert report is sufficient under section 74.351 by considering the opinions in the context of the entire report, rather than taking statements in isolation. *Rice v. McLaren*, 554 S.W.3d at 201. Multiple reports may be read in concert to determine whether the plaintiff has made a good-faith effort to comply with the statute's requirements. *Id*. Our review is limited to the four corners of the report, and we cannot make inferences to establish the causal connection. *Id*.

## Dr. Shukla

Dr. Shukla argues in his sole issue on appeal that the trial court erred in failing to dismiss Vaco's claims and in finding that the expert reports satisfied the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. Dr. Shukla, a bariatric surgeon, first saw Vaco on July 25, 2015 when he was admitted to Huntsville Memorial Hospital. Dr. Shukla ordered an EGD and an ultrasound. Vaco again saw Dr. Shukla on

August 17, 2015 for a follow-up on the EGD. Vaco served the expert report of Dr. John Pilcher, a bariatric surgeon, to address the standard of care and breach as to Dr. Shukla. After Dr. Shukla objected that the report was deficient, Vaco filed the supplemental report of Dr. Lovitt to address causation in relation to Dr. Shukla's care.

Dr. Pilcher states in the report that in Dr. Shukla's role as consulting bariatric surgeon, the standard of care required him to assess and to directly manage Vaco's fluid, electrolytes, and nutrition status. Dr. Pilcher provided specific actions to meet the standard of care including a plan for observation for tolerance of bariatric vitamin supplements. Dr. Pilcher also stated that Vaco had been experiencing a few days of prominent neurological complaints superimposed on many weeks of abdominal pain with nausea and emesis at the time Dr. Shukla first evaluated him. Dr. Pilcher states that the standard of care in this scenario is to administer empiric thiamine immediately. Dr. Pilcher further states:

> The occurrence of thiamine deficiency in bariatric surgical patients with nausea and vomiting is a well-known and highly feared complication of bariatric surgery. Thus, the Standard of Care requires that bariatric surgeons actively address potential nutrient/vitamin deficiencies in any bariatric patient who has recurring emesis or any bariatric patient with neurological complaints of any type. Since Mr. Vaco had BOTH of these conditions and was a classic high-risk case for thiamine deficiency, Dr. Shukla should have ordered thiamine supplementation at the time he received the consulting phone call or at the latest when he met Mr. Vaco in person. …
> Presented with a clinical scenario like Mr. Vaco's, the Bariatric Surgeon would then be expected to arrange testing for thiamine and other vitamins including B12, B6, A, C, D. There is no evidence that Dr. Shukla

accomplished any of these tasks for which he was responsible, and these failures are a clear deviation from the Standard of Care.

> The need to monitor for thiamine deficiency and to treat potential deficiency is frequently discussed in bariatric surgical education, for example in the 2008 publication "ASMBS Allied Health Nutritional Guidelines for the Surgical Weight Loss Patient."

In the supplemental report, Dr. Lovitt states that he reviewed the report by Dr. Pilcher. He notes that Dr. Pilcher opines that Dr. Shukla breached the standard of care for a bariatric surgeon by failing to observe the patient long enough to determine that the patient was able to tolerate oral fluids and nutrition sufficiently to be discharged from the hospital. Dr. Lovitt also noted that Dr. Pilcher finds that presented with a patient experiencing neurological complaints, the standard of care required Dr. Shukla to administer thiamine immediately. Dr. Lovitt does not express any opinion as to whether Dr. Shukla breached the standard of care. Dr. Lovitt states that:

> … given the fact of Mr. Vaco's continued deterioration and the progression of his Wernicke's encephalopathy, had Dr. Shukla ordered the empiric thiamine supplementation at the time he evaluated Mr. Vaco as Dr. Pilcher observes was the appropriate standard of care, in reasonable probability, this would have prevented the progression of Mr. Vaco's Wernicke's encephalopathy and the progression of his neurological symptoms. In reasonable probability, it would have prevented progression from temporary to longer lasting and possibility permanent disability.

Dr. Shukla argues that Dr. Lovitt's initial report was "no report" as to Dr. Shukla and the trial court abused its discretion in considering the criticisms of Dr. Shukla in the supplemental report of Dr. Lovitt. Dr. Lovitt filed an initial report that did not address Dr. Shukla's care of Vaco. Vaco concedes that Dr. Lovitt's initial report was "no report"

as to Dr. Shukla. Vaco served the report of Dr. Pilcher to address the care of Dr. Shukla. After the trial court granted a thirty day extension to cure the deficiencies in Dr. Pilcher's report, Vaco served the supplemental report of Dr. Lovitt to address causation as to Dr. Shukla. Dr. Shukla contends that because the initial report of Dr. Lovitt was no report as to Dr. Shukla, Vaco could not use Dr. Lovitt to supplement the report of Dr. Pilcher.

Section 74.351(i) of the Texas Civil Practice and Remedies Code provides:

Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

TEX. CIV. PRAC & REM. CODE ANN. § 74.351 (i) (West 2017). Because the statute allows a claimant to cure a deficiency, and that requirement like all others may be satisfied by serving a report from a separate expert, the statute does not prohibit Vaco from supplementing Dr. Pilcher's report with the report of Dr. Lovitt. *See Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008).

Dr. Shukla also argues that the trial court abused its discretion in failing to dismiss Vaco's claims because the causation opinions of Dr. Pilcher and Dr. Lovitt are conclusory. A causal relationship is established when the expert explains how the negligent act or omission was a substantial factor in bringing about the harm and that, absent that act or

omission, the harm would not have occurred.  *Rice v. McLaren*, 554 S.W.3d at 205.  The expert must simply provide some basis that the defendant health care provider's act or omission proximately caused injury.  *Owens v. Handyside*, 478 S.W.3d 172, 188 (Tex. App. —Houston [1st Dist.] 2015, pet. den'd).  The expert must explain the basis of his statements and link his conclusions to the facts.  *Id*.  A report that merely states an expert's conclusions regarding causation is not sufficient.  *Id*.

An expert report must explain, to a reasonable degree, how and why the alleged breach caused the complained of injury based on the facts presented.  *Id*.  The expert reports both set out the timeline of events detailing the delay in administering thiamine to Vaco.  Dr. Pilcher stated that Dr. Shukla should have ordered thiamine supplementation and Dr. Lovitt stated how the failure to do so in reasonable probability allowed the progression of the Wernicke's encephalopathy and the progression of the neurological symptoms.  The reports of Dr. Pilcher and Dr. Lovitt represent an objective good faith effort to inform Dr. Shukla of the causal relationship between the failure to adhere to the pertinent standard of care and the injury, harm, or damages claimed.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (l) (West 2017).  The trial court did not abuse its discretion in failing to dismiss Vaco's claims and finding that the expert reports satisfied the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. We overrule Dr. Shukla's sole issue on appeal.

## Dr. Schulte

Dr. Gavi, a physician with a specialty in internal medicine, provided an expert report that discussed the standard of care, breach, and causation as to Dr. Schulte. Dr. Lovitt also provided an expert report addressing only causation as to Dr. Schulte. Dr. Shulte brings three issues on appeal in which she argues: 1) the expert reports do not adequately establish qualification to discuss her conduct; 2) the expert reports fail to provide a sufficient opinion on the applicable standard of care and breach of that standard; and 3) the expert reports fail to adequately set forth a causal chain linking any alleged harm actually suffered to a specific breach of an applicable standard of care.

Section 74.401 of the Texas Civil Practice and Remedies Code provides:

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.401 (a) (West 2017). Dr. Schulte specifically argues in the first issue that Dr. Gavi's reports are deficient because they fail to establish that he has the knowledge, skill, experience, training, or education regarding the appropriate care and treatment of Vaco by Dr. Schulte, a primary care physician.

In his expert report, Dr. Gavi states that he is a licensed physician who currently practices as a hospitalist and as a primary care physician. He notes that he has practiced as a primary care physician since 2012 at a medical practice in California. Dr. Gavi further states that he is familiar with the standard of care for physicians practicing at an acute care hospital, at an ambulatory practice site, or office medicine. Dr. Gavi notes that he is familiar with the standard of care for patients post gastric sleeve surgery and for patients with ongoing nausea and vomiting. Dr. Gavi states that he is familiar with the condition of thiamine deficiency and the clinical consequences of thiamine deficiency, Wernicke's encephalopathy.

In determining whether an expert is qualified, we must be careful not to draw expert qualifications too narrowly. *Owens v. Handyside*, 478 S.W.3d at 186. The specific issue in this case as to Dr. Schulte, as a primary care physician, is whether she timely diagnosed and treated Vaco's condition. Dr. Gavi's report shows that as a primary care physician, he has experience in evaluating patients with nausea and vomiting and also neurological symptoms. Dr. Gavi is experienced with the treatment regimen for thiamine deficiency. Further, Dr. Gavi is familiar with the signs and symptoms of thiamine deficiency and the standard of care applicable to doctors who care for patients with thiamine deficiency. Dr. Gavi has the knowledge, skill, experience, education, and training to render an opinion on the standard of care applicable to a primary care doctor treating a patient with Vaco's condition. We overrule the first issue.

In the second issue, Dr. Schulte argues that Dr. Gavi's reports fail to provide a sufficient opinion on the applicable standard of care and breach of that standard. Dr. Schulte contends that Dr. Gavi's reports do not offer any factual basis to support his opinions or provide information on what should have happened differently.

In his reports, Dr. Gavi states that patients who undergo bariatric surgery are at a risk for malnutrition and that patients with ongoing nausea and vomiting are at a risk for malnutrition. Dr. Gavi notes that thiamine deficiency is a form of malnutrition and that all internal medicine physicians, including Dr. Schulte, should reasonably be able to identify. Dr. Gavi stated the following as the standard of care:

> Physicians generally, and this includes Dr. Schulte and Dr. McKeever, should be familiar with the signs and symptoms of thiamine deficiency. In patients exhibiting one or more of the signs and symptoms consistent with thiamine deficiency, such patients should be treated with intravenous thiamine. … Untreated thiamine deficiency is associated with profound neurological injury including confusion, numbness, unsteadiness, incoordination, abnormal gait, weakness, nystagmus, and other neurological signs and symptoms. If thiamine deficiency is delayed, then the symptoms may become permanent.
> In a patient with suspected thiamine deficiency, patients should receive intravenous thiamine and the physicians caring for such patients should be prepared to order sufficient doses of intravenous thiamine for multiple days. Furthermore, a physician should prescribe sufficient doses of oral thiamine at time of discharge to ensure proper absorption and replenishment of bodily reserves. How much is sufficient will be determined by re-checking thiamine levels after supplementation has begun, but every physician – and again, this includes Dr. Schulte and Dr. McKeever, should be prepared to order thiamine replacement for patients who suffer deficiency.

Dr. Gavi went on to discuss the breaches of the standard of care and detailed the facts leading to his opinion. Dr. Gavi stated:

> Dr. Schulte violated the standard of care by failing to promptly evaluate the new neurological signs and symptoms. Dr. Schulte had an obligation to form a differential diagnosis for the new neurological signs and symptoms. Included in that differential diagnosis should've been Wernicke's encephalopathy. If Dr. Schulte was unable to determine a reasonable diagnosis and also rule out conditions that could cause permanent neurological damage, then Dr. Schulte was obligated to obtain a neurological consult. This could've been obtained by a same-day neurology appointment or sending the patient to an emergency department capable of obtaining a neurology consult. The failure on July 24, 2015, to perform an urgent evaluation of the new neurological signs and symptoms was a breach in the standard of care.

Dr. Gavi further stated that Dr. Schulte breached the standard of care on July 25, 2015, by failing to diagnose Vaco with Wernicke's encephalopathy or obtaining a neurology consult. Dr. Gavi stated in his report that Dr. Schulte breached the standard of care on July 27, 2015, by discharging Vaco from the hospital without a clear diagnosis for the neurological symptoms and without diagnosing possible Wernicke's encephalopathy. Dr. Gavi noted that Dr. Schulte violated the standard of care by failing to treat for thiamine deficiency on multiple days and by failing to consult with a physician experienced in the management of Wernicke's encephalopathy after beginning treatment for thiamine deficiency to ensure proper treatment. Dr. Gavi further opines that Dr. Schulte breached the standard of care by discharging Vaco on August 1, 2015 without arranging a consultation with a neurologist and without providing for proper follow-up care.

The reports represent a good faith effort to provide a fair summary of Dr. Gavi's opinions as of the date of the report regarding applicable standards of care and the manner in which the care rendered by Dr. Schulte failed to meet the standards. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (l) & (r (6) (West 2017). Dr. Gavi states that Dr. Schulte failed to timely diagnose thiamine deficiency or consult with a neurologist for the neurological symptoms. Dr. Gavi states how Dr. Schulte should have managed Vaco's care. We overrule the second issue.

In the third issue, Dr. Schulte argues that the expert reports fail to link the damages sustained to any specific breach of an applicable standard of care. Dr. Gavi states that Dr. Schulte's failure to "appropriately evaluate the neurological signs and symptoms, form a reasonable differential diagnosis, treat possible thiamine deficiency, and obtain a neurology consult, caused the profound neurological injury that Mr. Vaco developed as a result of prolonged thiamine deficiency." Dr. Gavi further states that Vaco would have had no neurological injury or much milder injury but for the delayed diagnosis and treatment for thiamine deficiency. Dr. Lovitt stated in his expert report that Dr. Schulte's failure to recognize and diagnose Vaco's thiamine deficiency caused him to develop Wernicke's encephalopathy. Dr. Lovitt further states that the progression led to permanent neurological damage and deficits.

The expert reports explain how and why the alleged breach caused the neurological injuries to Vaco. *See Owens v. Handyside*, 478 S.W.3d 172, 188. We overrule the third issue.

## Dr. McKeever

In his sole issue on appeal, Dr. McKeever argues that the expert reports were deficient in that they failed to contain a factual analysis of a particularized standard of care for each practitioner. Dr. McKeever contends that the expert reports improperly use the same standard of care for multiple defendants.

Dr. Gavi addressed the standard of care applicable to Dr. McKeever. As discussed above in detail, Dr. Gavi stated that Dr. McKeever should have been able to identify thiamine deficiency and that he should have been familiar with the signs and symptoms of thiamine deficiency. Dr. Gavi stated that Dr. McKeever breached the standard of care:

> … on July 26, 2015, when he failed to perform a differential diagnosis for the symptom of dizziness. The nursing staff informed Dr. McKeever that Mr. Vaco was dizzy. Rather than form an appropriate differential diagnosis and an/or a reasonable definitive diagnosis, Dr. McKeever treated with meclizine as needed. Dr. McKeever had an obligation to form a differential diagnosis that included thiamine deficiency, given the context of weight loss, recent bariatric procedure, and ongoing nausea and vomiting. The failure to diagnose Wernicke's encephalopathy or obtain an urgent consult was a breach in the standard of care.

Dr. Gavi further stated that Dr. McKeever breached the standard of care when he failed to empirically treat for the possibility of thiamine deficiency with intravenous thiamine.

If more than one defendant is sued by a plaintiff, the plaintiff's expert report must outline the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *Pharmacy Healthcare Solutions, Ltd. v. Pena*, 530 S.W.3d 169, 175 (Tex. App. — Eastland 2015, pet. den'd). However, if multiple defendants owe the same duty to the patient, then the plaintiff is not required to specifically state the same standard of care for each individual defendant. *Id.*

Dr. Gavi indicated in his reports that Dr. Schulte and Dr. McKeever owe the same duty of care to Vaco. Dr. Gavi stated that the standard of care applied to internal medicine physicians and also to all physicians. Dr. Gavi stated that both Dr. McKeever and Dr. Schulte should have been able to identify thiamine deficiency and that they should have been familiar with the signs and symptoms of thiamine deficiency. Dr. Gavi specifically explained how Dr. McKeever breached that standard and the causal relationship to the injuries of Mr. Vaco.

The two purposes of the expert report are to inform the defendant of the specific conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 875. If the report fulfills its two purposes, it represents a good faith effort. *Palacios*, 46 S.W.3d at 879. The reports represent a good faith effort to provide a fair summary of Dr. Gavi's opinions as of the date of the report regarding applicable standards of care and the manner in which the care rendered by Dr. McKeever failed to meet the standards. *See* Tex. Civ. Prac. & Rem.

CODE ANN. § 74.351 (l) & (r (6) (West 2017). The trial court did not abuse its discretion in finding that the expert reports satisfied the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. We overrule the sole issue on appeal.

## Conclusion

We find that the trial court did not abuse its discretion in finding that the expert reports as to all appellants satisfied the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. We affirm the trial court's judgment.


JOHN E. NEILL
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Neill
Affirmed
Opinion delivered and filed April 24, 2019
[CV06]

